IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| PAMELA TOENNIES, | ) | CASE NO. 1:18-CV-1177 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Pamela Toennies ("Toennies") seeks judicial review of the final decision of

Defendant Commissioner of Social Security ("Commissioner") denying her applications for

Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  Doc. 1.  This

Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned

Magistrate Judge pursuant to the consent of the parties.  Doc. 13.

For the reasons explained below, the Commissioner's decision is **AFFIRMED**.

## I. Procedural History

Toennies filed applications for DIB and SSI on December 16, 2014, alleging a disability

onset date of October 2, 2011.  Tr. 11, 556.  She alleged disability based on the following: post-

traumatic stress disorder, anxiety, depression, and sleep disorders.  Tr. 616.  After denials by the

state agency initially (Tr. 390, 391) and on reconsideration (Tr. 416, 417), Toennies requested an

administrative hearing (Tr. 447).  Hearings were held before Administrative Law Judge Rini in

July and November 2016.  Tr. 279-363.  Her case was then reassigned to Administrative Law

Judge Loesel (hereinafter, "ALJ") and a third hearing was held on August 22, 2017.  Tr. 237-

277.  At the hearing, Toennies amended her alleged onset date to June 5, 2014.  Tr. 243, 602.  In

her September 25, 2017, decision (Tr. 11-26), the ALJ determined that there are jobs that exist in significant numbers in the national economy that Toennies can perform, i.e. she is not disabled. Tr. 25. Toennies requested review of the ALJ's decision by the Appeals Council (Tr. 555) and, on April 27, 2018, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-4.

## II. Evidence

### A. Personal and Vocational Evidence

Toennies was born in 1968 and was 45 years old on her alleged onset date. Tr. 603. The highest grade she completed was 8th grade. Tr. 289. She previously worked as a cashier and last worked in 2011. Tr. 251, 253.

### B. Relevant Medical Evidence[1]

Mental: Toennies received medical care from Neighborhood Family Practice (NFP). In 2014, she complained of chest pain and anxiety, was prescribed an inhaler, and took gabapentin, which helped her anxiety. E.g., Tr. 943-944. She was diagnosed with major depression and anxiety state. Tr. 940.

In January 2015, Toennies was diagnosed with major depression and episodic alcohol abuse. Tr. 931. She reported not feeling safe at home. Tr. 929. In April 2015, she visited NFP as a walk-in, reporting that she had started crying when she got off the bus "and came straight here." Tr. 924. She stated that her home life was disruptive and, as a result, she was using alcohol to forget. Tr. 924.

---

[1] Toennies includes evidence in her brief that was not before the ALJ but which she submitted to the Appeals Council. Doc. 16-1, pp. 15-16. The Appeals Council did not accept this evidence. See Tr. 2. Therefore, the Court does not consider this additional evidence in reviewing the ALJ's decision. Although a court may remand a case if the claimant includes evidence that is new and material, *see Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993), Toennies does not request a remand for the consideration of new and material evidence.

On June 16, 2015, Toennies presented to the emergency room at Lutheran Hospital for a suicide attempt earlier in the day; she had overdosed on her prescription medication, drank alcohol, and shortly thereafter vomited due to an upset stomach. Tr. 1345, 1363. She was admitted while unconscious. Tr. 1364. She had a seizure while in the emergency department. Tr. 1364. During her hospital stay she was confused, disoriented, was observed to be picking at air, and had visual hallucinations. Tr. 1351, 1364. She was discharged on June 22, 2015, diagnosed with major depressive disorder, alcohol abuse, suicide gesture, seizure due to alcohol withdrawal, hallucination, and a borderline personality disorder. Tr. 1376.

On July 9, 2015, Toennies started individual counseling at NFP with Bruce Catalano, a licensed independent social worker (LISW), with a diagnosis of borderline personality disorder and episodic alcohol abuse. Tr. 1282. She was assessed as being homeless, having been kicked out by her ex, and having unstable relationships. Tr. 1282-1283. Her adult son had assaulted her at home. Tr. 1283. She reported that her Paxil was working. Tr. 1279. She wanted to go back to the hospital because she got three meals a day, could relax, did crafts, and had others to talk to. Tr. 1279, 1282. Upon exam, she had an anxious and variable mood and scattered speech, switching topics rapidly. Tr. 1283. She was diagnosed with borderline personality disorder, major depression, alcohol use disorder, and PTSD. Tr. 1280. The next week she reported doing "good because I haven't been at the house"; she stayed at her sister's house most of the week. Tr. 1276. Upon exam, she was distracted by her own thoughts, had an impaired memory, coherent but tangential and circumstantial thoughts, and poor insight and judgment. Tr. 1277.

On July 30, Toennies asked Catalano at NFP if she was bipolar and was told that it was not likely. Tr. 1270. Toennies stated that she had been denied SSI benefits, had gotten an attorney, and asserted that she thought she had a better chance of getting disability if she were

bipolar. Tr. 1270. She wondered about work and Catalano encouraged her to "try some minimal jobs to see how she does." Tr. 1270.

On August 24, 2015, Toennies established care with primary care provider Ellen Gelles, M.D., at MetroHealth Hospital. Tr. 1017. She stated that she had been feeling very depressed lately and wanted to transfer her psychiatric care from NFP to MetroHealth. Tr. 1017. Dr. Gelles diagnosed depressive disorder and PTSD and gave her a referral to psychiatry. Tr. 1021.

On September 10, 2015, Toennies saw clinical nurse specialist (CNS) Susan O'Brien at NFP. Tr. 1250. She reported taking her medication regularly and felt that her Neurontin helped her anxiety and kept her level of agitation down. Tr. 1250. She had started participating in a group exercise program but was otherwise unmotivated and felt tired and apathetic. Tr. 1250. She reported intermittent suicidal ideation without intent and she was drinking again, although not as heavily as before. Tr. 1250. She reported issues with romantic relationships. Tr. 1250. Upon exam, she was calm, depressed, tired, indifferent, and cooperative with good eye contact, but she was distracted. Tr. 1250-1251. She had poorly organized, tangential, circumstantial thoughts and loose associations and an impaired memory. Tr. 1250-1251. O'Brien added the diagnosis "Cognitive deficits-? alcohol related." Tr. 1251.

On October 8, 2015, Toennies saw O'Brien at NFP. Tr. 1239. She reported that her mood was stable and she felt okay but apathetic. Tr. 1239. She felt that her anxiety was under control with the Neurontin. Tr. 1239. She was walking with a cane and explained that she had fallen in July when she was attending a concert and tripped, while wearing flip flops, on a metal grate. Tr. 1239. She reported having completed her "Feeling Good/Fit" class. Tr. 1239. She

reported intermittent suicidal ideation without intent and having thoughts of cutting her wrists, but she pushed past those thoughts using distraction. Tr. 1239.

On October 10, 2015, Toennies returned to Catalano for counseling at NFP. Tr. 1233. She reported finishing her group exercise program, which she had liked, and she was going to be starting with a new group. Tr. 1233. She was having issues dealing with romantic relationships. Tr. 1233. She was drinking more. Tr. 1233. She was encouraged to go to a support group and stated that she intended to go, and that she had reached out to a former member who she had become friends with in a prior group. Tr. 1233. Upon exam, she had a labile effect, scattered thoughts, and erratic and emotionally driven speech. Tr. 1233-1234.

On November 2, 2015, Toennies saw O'Brien at NFP. Tr. 1222. She had been more depressed and crying for the past week. Tr. 1222. She was dating and having problems with multiple relationships, including with her adult son and her ex. Tr. 1222. She was taking a new class which provided her with healthy recipes and was "ok." Tr. 1222. She denied self-injurious behavior or suicidal ideation in the last month. Tr. 1222. Upon exam, her memory was impaired, her thoughts were more organized but still with loose associations, and her mood was 10/10; "I feel pretty good." Tr. 1222. On November 5 she saw Catalano and reported verbal abuse from her ex and son, both of whom she lived with. Tr. 1216. She had become friends with another member of her healthy eating group. Tr. 1216. Her mood was up-beat and she had no suicidal ideation. Tr. 1216. She was generally anxious and seemed somewhat frightened about her living situation. Tr. 1216.

On November 17, 2015, Toennies went to the MetroHealth emergency room for complaints of severe depression for the past week and a half. Tr. 1163. She reported violence at home and was admitted. Tr. 1167. She denied hallucinations, stated that she would attempt to

hurt herself by cutting, and was assigned a Global Assessment of Functioning (GAF)[2] of 11-20, with some danger of hurting herself or others. Tr. 1167, 1170. She was admitted and discharged on November 18, 2015: her medications were adjusted and she was diagnosed with major depressive disorder and borderline personality disorder. Tr. 1178-1179.

On November 19, 2015, Toennies returned to NFP for a follow-up with Catalano. Tr. 1211. She discussed her hospital visit, stated that they had adjusted her medications, and, although she did not bring her discharge papers, she recited from memory the changes that they made (increased her Paxil to 30 mg and her Lamictal to 150 at night). Tr. 1211, 1178. She stated that she would be switching her care to MetroHealth. Tr. 1211. She had been experiencing intermittent suicidal ideation and reported that her son had hit her in the back after she returned from the hospital. Tr. 1211. She had plans to meet her boyfriend later that day and the next day planned to go to her class, where she would get a blender, and see her friend there. Tr. 1211. Toennies was encouraged to spend the weekend at her sister's house, and she agreed to do so. Tr. 1211. She was drinking daily but not as much as she had been. Tr. 1211.

On November 27, 2015, Toennies saw primary care physician Gustavo Gomez, M.D., at the Family Medical Clinic to establish care. Tr. 1092. She complained of chest discomfort. Tr. 1093. Dr. Gomez opined that the chest discomfort and shortness of breath she experienced was likely anxiety. Tr. 1096.

On December 3, 3015, Toennies underwent a mental health assessment with Mary Miller, M.D., at MetroHealth, to establish care. Tr. 1082. She expressed feelings of abandonment and

---

[2] GAF considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses. *See American Psychiatric Association: Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF between 11 and 20 indicates "some danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) or occasionally fails to maintain minimum hygiene (e.g., smears feces) or gross impairment in communication (e.g. largely incoherent or mute)." *Id.*

recent trauma and stated that, many years ago, she had engaged in self-harm behaviors (cutting). Tr. 1083. She used alcohol and the amount varied depending on her mood and what was going on in her house. Tr. 1083. She denied hallucinations. Tr. 1084. She endorsed a depressed mood, crying spells, feelings of hopelessness/worthlessness, guilt and irritability. Tr. 1084. Upon exam, she had a depressed mood and congruent affect and was anxious and in distress. Tr. 1087. She was oriented, had logical thoughts, good recent and remote memory, sustained attention and concentration, clear speech and appropriate language. Tr. 1084. Her insight, judgment and fund of knowledge were poor. Tr. 1084. Dr. Miller diagnosed her with major depressive disorder with borderline personality. Tr. 1087.

On December 9, 2015, Toennies returned to NFP for counseling with Catalano. Tr. 1206. She was observed crying in the waiting room while on the phone with an ex-boyfriend and explained that she was upset she was unable to reconnect with him. Tr. 1206. Upon exam, she was depressed and tearful but her mood improved throughout the session. Tr. 1206. On December 17, she was observed to be in a better mood, joking and talking more freely, but she was somewhat unfocused and moved from topic to topic and had scattered thoughts. Tr. 1204. She was using a walker to ambulate, explaining that a cyst was found on her leg. Tr. 1204.

In the early part of 2016, Toennies continued with counseling at NFP. E.g., Tr. 1522, 1508. These visits were similar to her prior visits.

On March 16, 2016, Toennies saw Catalano at NFP. Tr. 1497. She reported that, based on a dream she had had about one of her sisters, who had committed suicide, she decided to stop taking her medications. Tr. 1497. She resumed taking them because she did not feel as well without them. Tr. 1497. Catalano assessed her as emotionally stable but very vulnerable about issues regarding dating, easily manipulated, and vulnerable to exploitation. Tr. 1497. He

thought that she seemed to be learning to cope with relationship disappointments and trying to manage her emotions. Tr. 1497. Upon exam, she was "confused, depressed at times," and her speech was "difficult to follow with tangents, unfinished thoughts, and allusions." Tr. 1498.

Beginning on March 23, 2016, Toennies received substance abuse treatment from the Women's Recovery Center. Tr. 1304-1325. She was admitted to intensive outpatient treatment and was transferred to relapse prevention care on April 26, 2016. Tr. 1325-1326. She had participated well in group meetings. Tr. 1326. On May 13, 2016, a counselor from the Center authored a letter stating that Toennies was attending group meetings and making progress. Tr. 1300.

On May 18, 2016, Toennies presented to the emergency room at Fairview Hospital for self-inflicted cuts to the fingers on her left hand after trying to cut off them off with a paper cutter. Tr. 1329. Upon exam, she had a depressed mood, blunt affect, delayed and slowed speech, and impulsivity and inappropriate judgement. Tr. 1332. Her cuts were repaired with sutures and she was transferred to MetroHealth for psychiatric treatment. Tr. 1334. At MetroHealth, she underwent an extensor tendon repair of her left small finger due to a tendon rupture. Tr. 1448, 1450.

On May 31, 2016, Toennies saw Catalano at NFP for counseling. Tr. 1470. She was feeling better as a result of her stay at MetroHealth. Tr. 1470. She relayed her feelings regarding difficulties in her romantic relationships. Tr. 1470. Catalano observed that Toennies was better able to manage her emotions since she has been sober. Tr. 1470. She liked attending her AA meetings and was considering attending other meetings in the future recommended by the Women's Recovery Center. Tr. 1470. Upon exam, she was pleasant and cooperative and had normal speech "with usual vagueness and difficulty articulating feelings." Tr. 1471. On

June 1, she visited NFP to have her sutures removed.  Tr. 1466.  She was assessed as having a longstanding mild cognitive deficiency which concerned her now that she was sober.  Tr. 1468.

On June 8, 2016, Toennies admitted to Catalano that, at the time she attempted to cut off her fingers, she had stopped taking her medication because she thought she was doing better.  Tr. 1464.  She reported initiating the transfer of her counseling and case management treatment to Resource Recovery and no further appointments at NFP were made.  Tr. 1464.

On December 7, 2016, Toennies went to the emergency room at MetroHealth for severe depression and suicidal ideation.  Tr. 1585.  She was brought by the police department from "psych-SW" where she had been "pink-slipped."  Tr. 1585.  She denied hallucinations.  Tr. 1585.  She was diagnosed with a mood disorder and an episode of recurrent major depressive disorder.  Tr. 1586.  Her Paxil was reordered and she was discharged home in stable condition.  Tr. 1586.

On April 26, 2017, Toennies went to the emergency room at Lutheran Hospital due to major depression, suicidal ideation, and hallucinations.  Tr. 1615.  She was brought to the hospital by the police department after she had told her primary care physician that she was experiencing command auditory hallucinations to harm herself.  Tr. 1617.  She had been hearing voices since she had started taking Wellbutrin two weeks prior.  Tr. 1617.  She stated that she had been speaking to a girl, "Alice," who was telling her not to listen to the voices and that she had been speaking to Alice for two years.  Tr. 1617.  She reported that she was no longer working with a case manager.  Tr. 1617.  She was admitted and discharged on May 2 with a diagnosis of major depressive disorder, severe, recurrent without psychotic features, PTSD, and cluster B traits.  Tr. 1640.

On May 18, 2017, Toennies established care at Recovery Resources with Lindsey Kershaw, CNS, after having transferred from NFP.  Tr. 1648.  She reported that she had always

heard voices since she was five years old and has seen "Alice" daily since 2015. Tr. 1648. She reported that her moods and anxiety had been pretty good for the last six months. Tr. 1648. Upon exam, she had normal, fluent speech; normal attention/concentration; appropriate fund of knowledge; was alert, calm, and cooperative; did not have hallucinations or disturbances; had an intact memory; a constricted, stable and appropriate affect; a euthymic mood; fair insight and judgment; spontaneous, logical, goal-directed, appropriate thoughts; and no suicidal ideation. Tr. 1651-1652. She identified her main problem as having poor energy and being unmotivated; all other symptoms were relatively stable with Abilify and gabapentin. Tr. 1653. Kershaw added a low dose of Effexor for her depressive symptoms and diagnosed her with alcohol abuse in remission, PTSD, and major depressive disorder. Tr. 1653.

On July 17, 2017, at a counseling appointment at Resource Recovery with agency clinician Gretchen Bishop, Toennies had a flat affect, somewhat disorganized thoughts, and experienced visual hallucinations during the appointment. Tr. 1734-1735. On July 18, Toennies contacted Bishop and reported that she was seeing more people and being followed. Tr. 1737. Bishop suggested Toennies be seen by medical staff but Toennies stated that she was safe and would attempt to contact medical staff in the morning. Tr. 1737. On July 21, Bishop contacted Toennies and Toennies stated that she had managed her symptoms. Tr. 1737.

Physical: On June 20, 2014, Toennies went to the emergency room at Lake Health due to right foot pain and chest pain for a few days, worse with movement. Tr. 1040, 1044. She had gone to a minute clinic to have her foot checked out, the clinic noticed that she was short of breath, she advised them that she had chest pain, and they called an ambulance and sent her to the hospital. Tr. 1060. Toennies explained that a door had fallen on her foot a few days prior. Tr. 1044, 1060. She reported drinking a six-pack of beer a day for the last six months and that

her chest pain had started when she was drinking a few days ago. Tr. 1060. She had experienced shortness of breath for the last six months and her primary care physician had given her a prescription for an inhaler, but she had not used it. Tr. 1060. Upon exam, she had full strength and range of motion and intact sensation. Tr. 1060. An x-ray and EKG were negative. Tr. 1060. She was given Toradol, which she reported took away her pain. Tr. 1060. She was diagnosed with chest wall pain and foot pain and given a boot to use when walking. Tr. 1054, 1060.

On August 19, 2015, Toennies had a physical therapy evaluation at MetroHealth for a history of right leg pain. Tr. 994. She reported having right leg pain for a long time that had gotten worse and her leg would give way. Tr. 994-995. Upon exam, her gait was independent without an assistive device but antalgic with a decreased right stance time. Tr. 996. Her right leg strength was diminished compared to her left, her flexibility was within normal limits, and she had intact sensation and decreased function. Tr. 996. She was concerned that she had a blood clot, so she opted to leave the evaluation and walked to the emergency room. Tr. 997. At the emergency room, she complained of right thigh pain for the last week. Tr. 1002. She was not taking medication for her pain. Tr. 1002. Upon exam, she ambulated without difficulty on her right leg. Tr. 1003. She was found to have no risks for a blood clot and was diagnosed with an inner thigh muscle sprain and discharged home in stable condition. Tr. 1003.

On August 24, 2015, Toennies established care with primary care provider Dr. Ellen Gelles at MetroHealth. Tr. 1017. She complained of right leg pain for one year that was intermittent; it was worse when walking and went away within seconds when she stopped walking. Tr. 1017-1018. She was not taking medication for it. Tr. 1017-1018. She had had an

ultrasound that showed no clot or mass lesion.  Tr. 1018.  She was diagnosed with a right lower leg muscle strain and told to continue ibuprofen.  Tr. 1021.

On August 27, 2015, Toennies returned to physical therapy for her right leg.  Tr. 1031. Her pain was 0/10 but she stated that it can go up at times.  Tr. 1031.  She had an independent but antalgic gait and reduced right stance time.  Tr. 1032.  On September 22, she tried a straight cane and felt safer, so the physical therapist issued a straight cane for her to use at home at her request.  Tr. 1144.  She was assessed as having slow progress due to pain and there was no change in her walking speed or right knee flexion.  Tr. 1144.  She was not able to tolerate much exercise due to pain.  Tr. 1144.

Also on September 22, 2015, Toennies saw Jared Placeway, D.O., in the Pain Management Clinic at MetroHealth for a functional capacity assessment.  Tr. 1144, 1136.  She reported pain in her right thigh, but her pain can start in her lower back and radiate to her foot. Tr. 1137.  She reported a fall a year ago and few months ago when she tripped over a gate going to a concert.  Tr. 1137.  Upon exam, she walked with a straight cane and had an antalgic gait.  Tr. 1138, 1140.  She had a reduced spinal range of motion due to leg pain, tenderness of cervical paraspinal muscles, reduced right knee flexion, and tenderness to palpation of the distal medial hamstring and medial knee.  Tr. 1140.  She was able to lift ten pounds at waist level with mild pain but was unable to lift twenty pounds.  Tr. 1140.  Dr. Placeway reviewed the results of a CT scan of Toennies' cervical spine from June 2015, which showed mild degenerative disc disease at multiple levels.  Tr. 1140.  Dr. Placeway diagnosed her with cervical spondylosis with concern for cord compression requiring an MRI and diffuse right leg pain with unclear origin.  Tr. 1140. He opined that, with respect to her disability claim, it was very difficult to estimate her true functional capacity due to the unknown origin of her leg pain.  Tr. 1140.  He stated that Toennies

would be very limited at that time regarding any significant lifting and ambulation and, if her pain were to be controlled, she may be able to perform a sedentary position as she is not limited with her upper extremity motor skills. Tr. 1141. He stated that he could not predict her final functional capacity after treatment. Tr. 1141. He ordered a cervical MRI and x-rays of her spine, pelvis and knee. Tr. 1141.

On October 6, 2015, Toennies had an MRI of her cervical spine that showed multilevel spondylosis, most severe at C6-7. Tr. 1197. Her pelvic and right knee x-rays were normal. Tr. 1193, 1195. Lumbar x-rays showed mild degenerative spurring of the lumbar spine. Tr. 1191.

On October 9, 2015, Toennies went to NFP for a follow up appointment. Tr. 1235. She reported tingling in her right hand, which she thought was related to having used a cane the last month. Tr. 1235. She requested a wheeled walker. Tr. 1235. Her MRI results were reviewed and she was diagnosed with cervical spondylosis without myelopathy or radiculopathy and given a referral for a wheeled walker. Tr. 1237.

On October 16, 2015, Leslie Gibbs, nurse practitioner at NFP, wrote a note stating that Toennies needed a handicap placard because she was permanently disabled. Tr. 1038.

On October 20, 2015, Toennies followed up with Dr. Placeway for her right leg pain. Tr. 1128. Overall, her right leg pain had improved but her lower back pain had increased. Tr. 1128. She denied neck pain or radicular symptoms in her upper extremities. Tr. 1128. She could move her knee without significant pain. Tr. 1128. When on her feet for long periods, she had some burning pain in her right thigh. Tr. 1128. She was taking gabapentin and ibuprofen as needed, with decent relief of pain. Tr. 1128. Upon exam, her gait was narrow-based, mildly antalgic, and she had mild difficulty with balancing during the tandem gait. Tr. 1128. She had decreased sensation of the right lower extremity and diffusely bilateral hyperreflexic lower extremities. Tr.

1130.  Dr. Placeway diagnosed her with low back pain with L4, L5 radicular symptoms and cervical spondylosis.  Tr. 1131.   He continued her gabapentin and prescribed a Medrol dose pack, a lumbar MRI, and physical therapy.  Tr. 1132.

An MRI of Toennies' lumbar spine showed accentuation of the lumbar lordosis and mild spondylotic changes, including mild facet arthropathy at L4-5 and L5-S1.  Tr. 1188.

On November 3, 2015, Toennies began physical therapy for her low back and leg pain.  Tr. 1114.  Her pain was 6/10, worse with prolonged walking and better with medication.  Tr. 1117.  Her gait was slow and she used a straight cane.  Tr. 1118.

On November 9, 2015, Toennies went to NFP complaining of left-sided neck pain.  Tr. 1213.  Upon exam, she had a tender, red nodule on the left side of her neck and walked bent over with a cane.  Tr. 1214.  She was diagnosed with cervical spondylosis without myelopathy and prescribed a muscle relaxer and a wheeled walker.  Tr. 1214.

On November 10, 2015, Toennies followed up with Dr. Placeway for her low back pain, complaining of right leg pain.  Tr. 1109.  She reported 100% relief of back and leg pain while taking the steroids, and then her pain returned.  Tr. 1109.  Her thigh pain was 25% improved since her last visit.  Tr. 1109.  She had no neck pain.  Tr. 1109.  Upon exam, she used a straight cane to ambulate and her gait was narrow based, mildly antalgic, and she had mild difficulty with balance during tandem gait.  Tr. 1111.  Dr. Placeway diagnosed mild lumbar spondylosis, right medial hamstring pain (potential strain), and cervical spondylosis.  Tr. 1113.  Toennies declined injections or a surgical evaluation.  Tr. 1113.

On December 8, 2015, Toennies had a follow up visit Dr. Placeway and complained of continued right knee and hamstring pain, 4/10.  Tr. 1076.  She was using a four wheeled walker with a seat.  Tr. 1077.  Upon exam, her gait was narrow based and mildly antalgic.  Tr. 1079.

Dr. Placeway advised Toennies to continue physical therapy, schedule an MRI of her right knee/hamstring, and schedule lumbar facet medial branch blocks. Tr. 1080.

On December 9, 2015, Toennies presented to her physical therapy appointment using her wheeled walker and the therapist observed that she seemed more stable than when using a straight cane. Tr. 1074.

On December 14, 2015, an MRI of Toennies' right femur revealed a 2cm ganglion cyst at the superomedial aspect of the popliteal fossa. Tr. 1186. An MRI of her right knee showed a baker's cyst, the ganglion cyst in the popliteal fossa, and chrondomalacia involving the medial patellar facet and, to a lesser degree, the medial femoral articular cartilage. Tr. 1183.

On January 12, 2016, Toennies reported to her physical therapist that she was doing much better after a lumbar injection a few weeks prior and she no longer needed physical therapy. Tr. 1421. She stated that she no longer needed a cane or a walker. Tr. 1422. She was walking with normal walking speed and had full range of lumbar motion and good strength in her right leg. Tr. 1422. The therapist concurred that she was markedly better. Tr. 1422.

On April 11, 2016, Toennies saw Dr. Placeway for a follow up visit complaining of pain in her right leg, low back, and left knee. Tr. 1435. She was taking gabapentin three times a day and ibuprofen as needed, a couple times a week. Tr. 1435. She was not using the rolling walker anymore and instead used a cane. Tr. 1435. Upon exam, she had full motor strength, intact sensation, and her gait was narrow based and non-antalgic. Tr. 1437. She reported significant pain resolution following her lumbar block and was told to stretch and use heat as needed. Tr. 1439. Dr. Placeway stated that her right leg MRI was negative, "only showed ganglion cyst," and had "resolved." Tr. 1439. There was unclear etiology for her left knee pain, it was not painful that day, and it was likely tendonitis. Tr. 1439.

In late May 2016, Toennies had a central slip repair performed on her left small finger. Tr. 1430. She had a follow up on June 2 and was sent to occupational therapy for a relative flexion splint "and early range of motion." Tr. 1430-1431. She was instructed to wear the splint at all times and perform home exercises. Tr. 1414. On June 8, Toennies reported that she had not been wearing the splint much in the last three days and that she does better without it. Tr. 1411. She returned to plastic surgery on July 21 and was noted to have a mild flexion contracture and decreased composite fist in the setting of the slip repair. Tr. 1561. She was instructed on exercises and was to follow up in six weeks. Tr. 1561.

On July 25, 2016, Toennies saw Dr. Gelles with complaints of right low back pain. Tr. 1558. She stated the onset was one year ago when she fell on it, at which time she developed bruising and a lump, which had resolved. Tr. 1558. The pain was intermittent when carrying things or pressing on it. Tr. 1558. It had never been bad enough to take medication. Tr. 1558. Upon exam, she had slightly limited flexion but otherwise a normal range of motion and normal lower extremity strength and reflexes. Tr. 1560. Dr. Gelles diagnosed right sided low back pain without sciatica. Tr. 1560. Dr. Gelles remarked, "reassured—she was mostly worried that she injured herself during fall 1 year ago." Tr. 1560. Toennies did not feel that the pain was significant enough to take anything for it. Tr. 1560.

On September 19, 2016, Toennies saw Dr. Placeway for a follow up visit. Tr. 1541. Toennies reported consistent low right side back pain for the last year after a fall at a concert. Tr. 1541. She was taking gabapentin 2-3 times a day and ibuprofen once a day, which decreased her pain quite a bit. Tr. 1541. She currently had minimal pain. Tr. 1541. Upon exam, her gait was narrow based and non-antalgic. Tr. 1543. Dr. Placeway diagnosed low back pain, refilled her medication, advised daily stretching, and applying heat as needed. Tr. 1545.

On November 1, 2016, Toennies had a right L4-5 and L5-S1 facet joint steroid injection. Tr. 1601.

On November 21, 2016, Toennies saw Dr. Placeway and reported a reduction in pain following her injection, although she felt pain traveling down her right thigh. Tr. 1595. Upon exam, she had a narrow-based gait and a positive hip impingement sign. Tr. 1598. She was advised to use heat or ice on her thigh, consider hip imaging if her pain did not improve, and to continue her medications and add a muscle relaxant. Tr. 1598.

On November 27, 2016, Toennies returned to plastic surgery for a follow up of her left small finger. Tr. 1599. She had no complaints about the use of her hand, no limitations, and no pain. Tr. 1599. She had a 20 degree total arc of motion loss of her finger. Tr. 1599.

On January 16, 2017, Toennies returned to Dr. Placeway for a follow up of her right hip and low back pain. Tr. 1609. She was taking the muscle relaxer Robaxin daily, which improved her low back pain and her ability to ambulate. Tr. 1609. Her pain was achy and intermittent. Tr. 1609. She had not been using heat or doing stretching exercises. Tr. 1609. She had fallen the month before and landed on her left buttock. Tr. 1609. She still had mild pain in her buttock but it was much improved. Tr. 1609. Her physical exam findings were unremarkable. Tr. 1612. Dr. Placeway recommended Toennies use heat and stretching daily on her hip, try to wean off Robaxin and stop it entirely, and ordered a pelvic-ray. Tr. 1612.

On May 15, 2017, Toennies saw Dr. Placeway for complaints of shoulder girdle pain. Tr. 1655. Upon exam, she had full strength in her bilateral upper extremities, intact sensation, was hyper-reflexive, had a narrow-based gait, and positive tests showing shoulder impingement. Tr. 1658. Dr. Placeway ordered a left shoulder x-ray, ibuprofen as needed, shoulder stretching and exercises, and physical therapy. Tr. 1558. X-rays showed findings consistent with rotator cuff

tendinopathy.  Tr. 1662.

On May 22, 2017, Toennies went to the emergency room at MetroHealth complaining of left shoulder pain that was radiating down her left arm for the past few days.  Tr. 1664.  Upon exam, she had a normal gait, normal range of motion, 5/5 strength in her upper extremities and a strong hand grasp.  Tr. 1665.  She was diagnosed with left shoulder tendinopathy.  Tr. 1666.

On June 7, 2017, Toennies started physical therapy for a "left rotator cuff tear arthropathy."  Tr. 1682.  On July 10, she had improved: she had no complaints of pain at the start of her visit and improved shoulder range of motion.  Tr. 1708.

### C. Medical Opinion Evidence

#### 1. Treating Source

<u>Mental</u>: On June 1, 2016, Toennies's counselor at NFP, Bruce Catalano, LISW, completed a mental medical source statement on behalf of Toennies.  Tr. 1336-1337.  Catalano opined that Toennies had a rare ability to function independently without redirection and to understand, remember, and carryout complex job instructions.  Tr. 1336-1337.  She could frequently understand, remember and carryout simple job instructions.  Tr. 1337.  She had been diagnosed with major depressive disorder and PTSD and had a lack of coping skills interpersonally and internally.  Tr. 1337.  The next day, Richard Hill, M.D., Ph.D., co-signed the form.  Tr. 1337.

On August 8, 2017, Lindsey Kershaw, CNP, from Resource Recovery, completed a mental medical source statement that was divided into four headings.  Tr. 1792-1793.  Under the heading "Interacting with others," Kershaw opined that Toennies had a marked inability to handle conflict with others; understand and respond to social cues (physical, verbal, emotional); respond to requests, suggestions, criticism, correction and challenges; and keep social

interactions free of excessive irritability, sensitivity, argumentativeness or suspiciousness. Tr. 1792-1793. She opined that Toennies had either no, mild, or moderate limitations in the three remaining areas: understanding and applying information, adapting and managing oneself, and maintaining concentration, persistence, and pace for tasks. Tr. 1792-1793.

Physical: On November 11, 2016, Dr. Placeway completed a physical medical source statement on behalf of Toennies. Tr. 1577-1578. He opined that Toennies was limited to a range of sedentary exertional activity (lifting/carrying less than 10 pounds frequently and 10-20 pounds occasionally; standing/walking 2 hours, 33 minutes without interruption; sitting 4-6 hours, 30-40 minutes without interruption), could rarely perform postural maneuvers, could occasionally use upper extremities for manipulative functions, would need to alternate positions throughout the day, and would require unscheduled breaks for up to 30 minutes each day. Tr. 1577-1578. Her pain was moderate and would interfere with her concentrate, take her off task, and cause absenteeism. Tr. 1578.

## 2. Consultative Examiner

Mental: On February 24, 2015, Toennies saw psychologist Richard N. Davis for a psychiatric consultative examination. Tr. 861-868. Dr. Davis opined that Toennies was limited in her ability to perform anything but very simple tasks, she apparently dealt appropriately with supervisors and co-workers in her prior work settings, and she did "not appear to be in any condition at this point in her life to deal with much stress or pressure." Tr. 866. He diagnosed her with major depressive disorder, recurrent, severe; alcohol use disorder, moderate to severe; PTSD; panic disorder; and dependent personality disorder. Tr. 866-867. He observed that she was somewhat restricted in her daily activities and she was able to take care of her personal needs. Tr. 867.

On June 16 and 23, 2016, Toenies underwent a psychological assessment with Erika Staneft, Psy.D.  Tr. 1387-1393.  She was given the Weschler Adult Intelligence Scale, 4th edition, and achieved a full scale IQ of 66, which is in the extremely low range.  Tr. 1389.  Dr. Staneft, however, stated that the score should be interpreted with caution due to the fact that Toennies had a limited education; she had performed better on non-verbal tasks then verbal tasks; and, because her left, dominant hand was in a cast from a recent surgery, it may have impacted her non-verbal and processing speed tasks.  Tr. 1389.  Regarding her testing in adaptive functioning, which Dr. Staneft again advised should be interpreted with caution due to the fact it was based on Toennies' self-reporting, Toennies was found to have receptive communication skills similar to a child of 7 years/5 month; written communication skills equal to a child of 6 years/1 month; personal daily living skills equal to a child of 7 years/5 months; community daily living skills similar to a child of 9 years/8 months; interpersonal skills of a child of 4 years/8 months; coping skills of a child of 7 years/1 month; and play and leisure time skills of a child of 2 years/7 months.  Tr. 1390-1391.  Dr. Staneft diagnosed Toennies with a mild intellectual disability, PTSD, alcohol dependence in early remission, and a provisional borderline personality disorder.  Tr. 1392.  She opined that Toennies would benefit from enrolling in developmental disability services, an adult day program, a group home, and having a payee.  Tr. 1393.

Physical: On July 6, 2016, Toennies underwent a one-time physical capacity evaluation with physical therapist James McDonald, PT, DPT.  Tr. 1396, 1645.  McDonald explained that the evaluation was "designed to assist physician in making recommendations regarding client's application for disability."  Tr. 1645.  McDonald opined that Toennies was limited to sedentary exertional activity.  Tr. 1396.  She could perform part time work, sitting for up to 4 hours and 12 minutes and standing for up to 2 hours and 26 minutes.  Tr. 1396.  She could lift between 10 and

15 pounds and frequently reach, occasionally perform simple grasping, fine or gross coordination, bend, kneel, crawl, and climb stairs, and must avoid firm grasping and static balance.  Tr. 1396.  He opined that Toennies provided consistent effort during the evaluation and that her pain ratings "could have been considered a limiting factor during functional testing."  Tr. 1398.

### D. Testimonial Evidence

#### 1. Toennies' Testimony[3]

Toennies was represented by counsel and testified at the administrative hearings.

<u>November 10, 2016 hearing</u>: Regarding her knee problem, Toennies testified that it first occurred in 2003 but that she never got it checked.  Tr. 307.  She had gotten a cane in 2015 due to knee and low back pain.  Tr. 307-308.  She recounted her last job as a cashier at K-Mart.  Tr. 323.  She left that job because she was in an abusive relationship and would come to work with black eyes and could not handle customers staring at her.  Tr. 324.  She left her cashier job at Save-A-Lot because of anxiety and depression; she could not deal with the customers.  Tr. 324.  When asked if she could perform a cashiering job currently, Toennies stated, "not as good as I used to."  Tr. 325.  She explained that she cannot focus or be around 10 or more people and likened the feeling to claustrophobia.  Tr. 325.  When asked if she could be on her feet all the time, Toennies stated that she would still have to sit at the register on a stool, as she had previously done when she performed her cashiering work.  Tr. 326, 319.  She could only stand for 2 hours and could lift about 10 pounds.  Tr. 327.

---

[3] There were three hearings in this case and only the third was before the ALJ who decided Toennies' case.  At the first hearing, the prior ALJ primarily went over the medical record with counsel.  Tr. 336-363.  The Court, therefore, does not include a summary of the first hearing testimony.

August 22, 2017 hearing: Toennies testified that she lived in a house with her adult son and his father, her ex. Tr. 249-250. She helps out with chores such as vacuuming. Tr. 249, 250. She does not cook; she can't. Tr. 249. She is not able to get herself a bowl of cereal or make herself a sandwich; her son does that. Tr. 250. If she is hungry while he is at work, she waits for him to get home. Tr. 250. She does not do laundry and she cannot drive and has never driven. Tr. 250. If she needs to go someplace she takes the bus. Tr. 251. Her hobby is walking. Tr. 251. She does not take walks for exercise and does not do any kind of exercise. Tr. 251. She sees her sister about once a week and speaks to her on the telephone. Tr. 251. She has no friends that she keeps in touch with. Tr. 251.

Toennies described her past work. At Save-A-Lot she was on her feet the whole time as a cashier and doing some work stocking; the heaviest she lifted was a 5-pound bag of potatoes. Tr. 252. She worked about six hours, three days a week, for about a year. Tr. 253. Prior to that she worked as a cashier at K-Mart for five years. Tr. 253. She worked seven hours a day up to five days a week. Tr. 254. She was standing most of the time she worked and the most she had to lift was five pounds. Tr. 254.

Toennies has a cell phone and uses it to call her sister when she needs to get calmed down. Tr. 255. She rarely texts or uses Facebook. Tr. 255. She does not watch television or listen to music because she can't focus enough. Tr. 255. She does not read anything because her eyesight is bad. Tr. 255. She goes to places outside the house, such as the grocery store. Tr. 256. If she was to do something fun for herself, she would walk somewhere. Tr. 256. When she walks she has no destination. Tr. 256.

When asked what her biggest problem was that kept her from working on a full time basis, physically or mentally, Toennies answered, "My mental health." Tr. 257. She stated, "I'm

hearing voices that I'm not answering now." Tr. 257.  She had been hearing voices for six months.  Tr. 257.  She is treated for this by taking Abilify, which makes a difference with the voices and calms them.  Tr. 257.  She also takes other medication for her mental health, which has helped her.  Tr. 257.  She is not hearing the voices very often and she needs the gabapentin, which she takes for anxiety.  Tr. 258.  She experiences anxiety about once a week.  Tr. 258.  The cause of her anxiety is her household, usually her son yelling at her because she cannot do anything right.  Tr. 258.  Her depression is not really an issue for her anymore.  Tr. 259.  She takes Paxil and it helps her about ¾ of the time.  Tr. 259.  When it is not helping her, she just sits there and does nothing and tries to think of things to do.  Tr. 259.

Toennies stated that she has been sober since March 21, 2016, seventeen months ago.  Tr. 259.  To achieve sobriety, Toennies just picked up the phone to call for help and went to a women's center.  Tr. 259.  Her sobriety has made a difference with her mental health and other issues.  Tr. 260.  Now she is able to go and do things that she wasn't able to do when she was drinking, such as walking and talking to people.  Tr. 260.  Drinking kept her away from being able to have friends.  Tr. 260.  Walking helps her feel better energy-wise.  Tr. 260.  Physically, at this point, Toennies feels "blah."  Tr. 260.  She doesn't feel like she has any feelings; she is empty.  Tr. 261.  She believes it is related to her depression and that she is still having some depression.  Tr. 261.  She has difficulty comprehending things.  Tr. 267.  She has to have people repeat things or explain them to her; this has been happening for "a little while now."  Tr. 267.

Toennies also stated that her sobriety has not helped her conditions and that they have stayed the same.  Tr. 268.  It has helped her get out more.  Tr. 268.  When asked if she had difficulty riding the bus, Toennies stated that she has to sit in the front because there are too many people.  Tr. 268-269.  She explained that five people were too many.  Tr. 269.  She goes to

AA meetings three to five times a week.  Tr. 269.  She goes to the lead meetings, rather than the discussion meetings, "because ... I can't comprehend."  Tr. 269.  She prefers not to discuss with other people because she feels like she would be stupid.  Tr. 269.  She has made friends in the meetings.  Tr. 269.  She has a book of names and phone numbers.  Tr. 269.  She calls them a lot but does not get together with them outside the meetings.  Tr. 269.

When asked to describe a bad day, Toennies stated that she gets anxiety from her son and has to go for a walk.  Tr. 261.  A good day is when her sister calls and asks her to go out for a walk and gets Toennies out of the house; otherwise she is just sitting there.  Tr. 262.  Her sister lives about three miles away and they are pretty close.  Tr. 262.

When asked about her back injections, Toennies stated that the last time she had an injection was December 2016, about eight months ago.  Tr. 263.  It helped her back.  Tr. 263.  Then the doctor moved to a new office farther away, and when she saw the doctor who replaced him at the original office she had a "mini stroke or something because I don't remember anything."  Tr. 263.  The injection she had in December 2016 lasted "only like a month."  Tr. 264.  She had physical therapy for her left shoulder and is still doing the exercises at home.  Tr. 264-265.  They don't really help, however, and her shoulder is "still killing me."  Tr. 264.  She has tendonitis in it and the pain goes all the way down her arm into her hand and impacts her strength.  Tr. 265.  She thinks she could lift five pounds.  Tr. 265.  She tries not to lift anything with her left hand.  Tr. 265.  She has trouble reaching behind but she can reach up and forward.  Tr. 265-266.  Her grasping strength is also affected but she does not have trouble using her fingers.  Tr. 266.  She has numbness in her fingers.  Tr. 266.  All they can give her is Tylenol for it.  Tr. 266.

### 2. Vocational Expert's Testimony

24

A Vocational Expert ("VE") also testified at the August 2017 hearing. Tr. 271-276. The ALJ discussed with the VE Toennies' past work as a cashier-checker. Tr. 271. The ALJ asked the VE to determine whether a hypothetical individual of Toennies' age, education and work experience could perform her past work or any other work if that person had the limitations assessed in the ALJ's RFC determination, and the VE answered that such an individual could not perform her past work but could perform other jobs in the national economy such as merchandise marker, cashier II, and housekeeping cleaner. Tr. 272-273.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a

severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[4] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy. *Id.*

## IV. The ALJ's Decision

In her September 25, 2017, decision, the ALJ made the following findings:

1.      The claimant meets the insured status requirements of the Social Security Act through June 30, 2015. Tr. 14.

2.      The claimant has not engaged in substantial gainful activity since June 5, 2014, the amended alleged onset date. Tr. 14.

3.      The claimant has the following severe impairments: osteoarthritis of the cervical spine; lumbar facet arthropathy; right knee patella tendonitis; left rotator cuff arthropathy; left small finger extension tendon repair; affective disorder (major depressive disorder); anxiety disorder (post-traumatic stress disorder, panic disorder); personality disorder (dependent personality disorder, unspecified borderline personality disorder); borderline

---

[4] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 *et seq.* The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq.*, corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

intellectual functioning and substance addiction disorder (alcohol use disorder, cannabis use unspecified in sustained remission).  Tr. 14.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 14.

5. The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except for the following limitations.  The claimant can lift and carry 20 pounds occasionally and 10 pounds frequently.  The claimant can stand and walk six hours of an eight-hour workday, and can sit for six hours of an eight-hour workday.  The claimant can perform unlimited pushing and pulling, other than shown for lifting and carrying.  The claimant can occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds.  The claimant can occasionally stoop, kneel, crouch, and crawl.  The claimant can perform occasional reaching with the left upper extremity, and frequent handling and fingering with the left upper extremity.  The claimant can perform simple, routine tasks (unskilled work) with infrequent changes and with no fast pace or high production quotas.  The claimant can engage in superficial interaction with others (meaning of short duration and for a specific purpose) and can perform low-stress work meaning no arbitration, negotiation, responsibility for the safety of others, or supervisory responsibility.  Tr. 17.

6. The claimant is unable to perform any past relevant work.  Tr. 24.

7. The claimant was born in 1968 and was 45 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  Tr. 24.

8. The claimant has a limited education and is able to communicate in English.  Tr. 24.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.  Tr. 24.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  Tr. 25.

11. The claimant has not been under a disability, as defined in the Social Security Act, from June 5, 2014, through the date of this decision.  Tr. 25.

**V. Plaintiff's Arguments**

Toennies challenges the ALJ's decision on two grounds: the ALJ's step three determination with respect to listing 12.04 is not supported by substantial evidence and the ALJ violated the treating physician rule. Doc. 16-1, pp. 19-26.

## VI. Legal Standard

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

## VII. Analysis

### A. The ALJ did not err at step three

Toennies argues that the ALJ erred at step three when she found that Toennies did not satisfy the paragraph B criteria of 12.04, "Depressive, bipolar and related disorders." Doc. 16-1, pp. 23-25. Listing 12.04 requires that a claimant satisfy criteria set forth in paragraphs A and B or paragraphs A and C. 20 CFR Part 404, Subpart P, Appendix 1. Paragraph A sets forth diagnoses and Paragraph B sets forth limitations. To satisfy the paragraph B criteria, a claimant must have

> A mental disorder [that] result[s] in "extreme" limitation of one, or "marked" limitation of two, of the four areas of mental functioning.

       1. Understand, remember, or apply information (see 12.00E1).
       2. Interact with others (see 12.00E2).
       3. Concentrate, persist, or maintain pace (see 12.00E3).
       4. Adapt or manage oneself (see 12.00E4).

*Id.* The ALJ found that Toennies had moderate limitations in all four areas. Tr. 15-16.

Toennies argues that the ALJ erred when she determined that Toennies had only moderate limitations in the areas of adapting or managing oneself and interacting and relating to others. Doc. 16-1, p. 26. She asserts that the ALJ narrowly looked at these areas of functioning and cherry-picked the evidence. Doc. 16-1, p. 26.

*Interacting and relating to others.* With respect to interacting and relating to others, the ALJ explained:

> The historical record demonstrated evidence of extensive past trauma, which treating and examining sources have noted to cause some difficulty with trusting others. The claimant related much of her current anxiety to specific interpersonal difficulties, including her living situation with her ex-partner and her adult son, with evidence of some ongoing abuse in that environment. The claimant's testimony has been that she experiences exacerbation of her mental health symptoms when around groups of approximately five or more people, which she considers to be a "crowd." Despite these difficulties, during the consultative examination with Dr. Davis in February 2015, the claimant denied problems interacting with supervisors and coworkers on past jobs. While she was tearful and had delay responding to questions during that exam due to her emotional lability, this was noted to be during the claimant's active alcohol abuse, and more recent observations of treating sources since her sobriety date in March 2016 generally have not revealed this level of tearfulness or emotionality. The claimant generally interacted in a pleasant, cooperative manner with treating sources and was able to comply with directions. The claimant described some good relationships, including with her sister, who she spends time with often throughout the week. The claimant testified that she does not have friends, but she admitted this was due to her past lifestyle of excessive alcohol use. Treatment notes suggested she avoided some groups of people to maintain her sobriety and to avoid triggers for her alcohol cravings. The claimant was able to go out into the public on her own to attend medical appointments and to shop, without any evidence of significant exacerbation of her symptoms. Treatment notes identified other social activities such as going to cookouts, playing pool, dating, and visiting the zoo. (Exhibit 30F, p. 25). The claimant could also tolerate being around others sufficiently to take public transportation. The claimant related adequately at each hearing held in this manner [sic], and was cooperative in answering questions and providing information.

Tr. 15-16.

Toennies points out evidence that she believe supports a finding that she had a marked limitation in this area: she had visual and auditory hallucinations, including command auditory hallucinations telling her to injure herself; psychological testing showed she had social skills of a four-year-old and seven-year-old; she was observed to have scattered, tangential thoughts, scattered speech, and was unfocused and difficult to follow; and her counselor at Resource Recovery, Lindsey Kershaw, opined that she had marked limitations in various areas of interacting with others. Doc. 16-1, p. 25.

Of the records Toennies cites in support of her having been observed with scattered thoughts and speech and being unfocused and difficult to follow (Tr. 1234, 1254, 1204, 1468, 1498), all but one (Tr. 1468) are records dated prior to her sobriety date, March 23, 2016. The ALJ explained that, generally, Toennies' exam findings after her sobriety date were not as severe, a finding Toennies does not challenge. The one record Toennies cites that is dated after her sobriety date (Tr. 1468) does not support Toennies' argument; this record shows that Toennies, upon exam, was alert and oriented and had a normal mood and affect.

As for her psychological test results indicating 4- and 7-year-old functioning, the ALJ, elsewhere in her decision, commented that the examiner administering the testing, Dr. Staneft, opined that the results should be interpreted with caution. Tr. 22. The ALJ considered Toennies' hallucinations, including her command auditory hallucinations with suicidal ideation, but accurately remarked that hallucinations were not present throughout the entire period. She had denied hallucinations during a consultative exam in March 2015 and first presented with hallucinations in an emergency room visit during an acute period of suicidal ideation and alcohol withdrawal in June 2015, at which time she improved during her brief inpatient stay and resolved by her discharge date. She reported command hallucinations in April 2017, during another acute

episode that appeared to be caused by taking Wellbutrin, which she had recently started, and subsequent treatment notes indicated only intermittent hallucinations, which Toennies stated were manageable. Tr. 22. This is evidence that supports the ALJ's findings and Toennies does not challenge any of these findings.

Lastly, although Kershaw opined that Toennies had marked limitations in various abilities interacting with others, she also opined that Toennies had mild or moderate limitations in other abilities interacting with others. Tr. 1792. The ALJ considered the entirety of Kershaw's opinion; she did not, therefore, cherry pick the evidence, as Toennies contends. Substantial evidence supports the ALJ's finding that Toennies had a moderate limitation in interacting and relating to others.

*Adapting or managing oneself*. With respect to adapting or managing oneself, the ALJ explained:

> ...the claimant has experienced a moderate limitation. She reported problems managing her mood. She reported a history of difficulty with math skills and inability to mange her finances. She also reported some poor motivation for self-care tasks. Objective observations demonstrated some poor hygiene and grooming at times, but this appeared to correspond more significantly to periods of alcohol use. Recent observations in July 2017 indicated that she had good grooming and was dressed appropriately for weather. (Exhibit 30F, p. 3). The claimant was able to manage her food stamps. The record revealed some inconsistency with activities of daily living, but there was also evidence of homelessness or moving between the homes of friends or family members that would have affected her ability to engage in routine activities. The claimant can perform basic household chores including doing laundry, preparing simple meals, cleaning, and yard work. Treatment notes demonstrated improvement in her mood and decreased symptoms of tearfulness with sobriety and compliance with mental health treatment recommendations. Observations of treating sources did not demonstrate any difficulty with temper control or excessive irritability.

Tr. 16-17.

Toennies cites evidence in support of her argument that she had a marked limitation in this area, but, again, most of her cited records pre-date her sobriety date. Doc. 16-1, p. 25. The

ALJ explained that her symptoms improved with sobriety.  The only record Toennies cites that does not predate her sobriety date is a treatment note from June 2016, when she was tearful when she saw her counselor, Catalano.  Tr. 1459-1460.  But Toennies was tearful that day because her son had punched her the night before and she was deciding whether or not to press charges, having spoken to her sister and the prosecutor, and was also exploring short-term alternative living situations, such as with her sister or niece, as she currently lived with her son.  Tr. 1459.  She also admitted that she had not been taking her medications, something she had admitted at her prior session with Catalano.  Tr. 1459.  The ALJ accurately explained that Toennies' symptoms in this area of functioning were inconsistent due to moving between family members and that her mood was improved when she was compliant with treatment.  In other words, the medical record cited by Toennies simply provides further support for the ALJ's finding; it does not undermine it.

Finally, Toennies points out that, while sober, she had tried to cut off her fingers, had five emergency visits, and was admitted to the hospital once for depression, hallucinations, and suicidal ideation.  Doc. 16-1, p. 26 (citing Tr. 199, 210, 1329, 1585, 1615).  The ALJ explained, however, that Toennies' April 2017 hospital admission (Tr. 1615) was due to symptoms she had after starting Wellbutrin.  Tr. 22.  Two treatment notes Toennies cites (Tr. 199, 210) were not in the record and may not be considered by this Court, as explained, *supra*.  And, in any event, Tr. 199 is another record of her April 2017 hospital stay.  When she attempted to cut off her fingers (Tr. 1329), she had not been taking her medication (Tr. 1464).  The ALJ's determination that Toennies had moderate limitations in adapting or managing oneself is supported by substantial evidence.

In sum, the ALJ's determination that Toennies does not have a marked impairment in two of the paragraph B criteria is supported by substantial evidence.

### B. The ALJ did not violate the treating physician rule

Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(c)(2). If an ALJ decides to give a treating source's opinion less than controlling weight, she must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Wilson*, 378 F.3d at 544. In deciding the weight given, the ALJ must consider factors such as the length, nature, and extent of the treatment relationship; specialization of the physician; the supportability of the opinion; and the consistency of the opinion with the record as a whole. *See* 20 C.F.R. § 416.927(c); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 747 (6th Cir. 2007).

Toennies argues that the ALJ violated the treating physician rule because she did not give Dr. Placeway's opinion controlling weight. Doc. 16-1, p. 20. The ALJ considered Dr. Placeway's opinion:

> Similarly [to the little weight given to McDonald's opinion], the undersigned can give little weight to the opinion of Dr. Placeway on November 11, 2016. The pain management physician opined the claimant was limited to a range of sedentary exertional activity, could rarely perform postural maneuvers, could occasionally use upper extremities for manipulative functions, would need to shift between positions throughout the day, and would require unscheduled breaks for one-half hour each day. (Exhibit 23F). This treating source opinion is not entitled to controlling weight, for several reasons. Dr. Placeway based this medical source statement on the findings and opinion of the functional capacity evaluation performed by Mr. McDonald, advancing almost identical limitations as those set forth during the one-time evaluation. It appears Dr. Placeway did

not consider his own findings of improvement in the claimant's physical functioning demonstrated throughout this period, including the claimant's reports after a medial branch injection in November 2015, which provided relief for several months such that she denied needing further physical therapy and indicated she no longer used an assistive device in January 2016. While subsequent records demonstrated a return of some of this pain in late 2016 around the time Dr. Placeway issued this checklist opinion, he observed that her pain was under good control with Neurontin and Robaxin, and he ordered another lumbar facet injection in November 2016, which again provided relief. Further, both Mr. McDonald's and Dr. Placeway's opinions are inconsistent with the claimant's own allegations, which admit that her disability is primarily mental in nature. At the consultative examination with Dr. Davis in March 2015, she reported that there was "nothing wrong with her physically" and she had not been in the hospital for any physical problems, nor did she have any medical treatment scheduled. (Exhibit 3F, p. 4).

Tr. 20-21. Toennies asserts that this analysis fails to follow the presumed deference standard by considering evidence that is consistent and supportive. Doc. 16-1, p. 21. The undersigned disagrees; the ALJ explained why she did not find Dr. Placeway's opinion consistent with and supported by other evidence in the record and, therefore, not entitled to controlling weight. *Wilson*, 378 F.3d at 544.

Next, Toennies contends that the ALJ failed to give good reasons for the weight she gave to Dr. Placeway's opinion. Doc. 16-1, p. 21. She criticizes the ALJ for reasoning that Dr. Placeway's opinion was based on McDonald's opinion when Dr. Placeway provided the basis for his assessed limitations in his opinion: imaging results and exam findings. Doc. 16-1, p. 21. But Dr. Placeway's apparent reliance upon McDonald's opinion was not the only reason the ALJ gave for assigning little weight to Dr. Placeway's opinion. The ALJ also found fault with Dr. Placeway's opinion because he did not take into account his own findings that Toennies improved significantly with treatment. Moreover, the ALJ had previously recounted that Toennies' diagnostic imaging showed only mild to moderate findings, physical examinations throughout the period were relatively unremarkable, and Toennies regularly reported significant improvement with medication and injections. Tr. 18-19.

Toennies argues that Dr. Placeway expressly stated in his opinion that Toennies' positive response to medial branch blocks was a finding that supported his assessment. Doc. 16-1, p. 22. Therefore, she asserts, Dr. Placeway did take into account Toennies' positive response to injections in his opinion, contrary to the ALJ's assertion. Doc. 16-1, p. 22. But, as the ALJ explained, Toennies' positive response to her treatment was such that she no longer needed physical therapy, no longer needed an assistive device, and had significant relief from her symptoms. Tr. 19, 20. Her pain returned, but her injections provided relief and she had them one year apart; in the interim, her medication controlled her symptoms. Tr. 20. In short, her response to treatment should have supported less, not more, restrictive limitations.

Finally, Toennies submits that the ALJ was misled by Toennies' statements made during a mental health consultative examination in March 2015, in which she stated that her disability is primarily mental in nature. Doc. 16-1, p. 22. She asserts that her knee, back, thigh and cervical pain developed after this examination and points to diagnostic imaging performed in October and December 2015. Doc. 16-1, p. 22. However, the ALJ explained that Toennies' diagnostic imaging showed mild to moderate degenerative changes and commented that Toennies had testified at her hearing in August 2017 that her disability was primarily mental in nature. Tr. 18. She commented that Toennies had testified that she walked for exercise and transportation. Tr. 20. She also did household chores and yardwork, played pool, visited the zoo, and socialized. Tr. 20. Toennies does not challenge these findings by the ALJ. The ALJ's characterization of Toennies' statements that her disability is primarily mental in nature is accurate and supported by substantial evidence. The ALJ's decision, therefore, must be affirmed. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) (the Commissioner's decision is upheld so long as substantial evidence supports the ALJ's conclusion).

## VIII. Conclusion

For the reasons set forth herein, the Commissioner's decision is **AFFIRMED**.


IT IS SO ORDERED.



Dated: March 25, 2019

*/s/ Kathleen B. Burke*
_____
Kathleen B. Burke
United States Magistrate Judge